UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

FAHEEM ABDUL-JALEEL,

                            Petitioner,                    DECISION AND ORDER

vs.                                              18-CV-6183 (CJS)

M. KIRKPATRICK, *Superintendent of Clinton Correctional Facility*,

                            Respondent.

_____

After a jury trial in County Court for Monroe County, New York, Petitioner Faheem Abdul-Jaleel was convicted on one count of attempted murder in the second degree, and one count of assault in the first degree. He was sentenced to two determinate terms of sixteen years of imprisonment, to run concurrently. *See, e.g.,* Trial Tr. Vol. V, 70–71,[1] June 11, 2018, ECF No. 6-5. The matter is now before the Court on Petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pet., Mar. 2, 2018, ECF No. 1.

Construing Petitioner's papers to present the strongest arguments they suggest, Petitioner seeks relief on five grounds: (1) the trial court failed to meaningfully answer jury questions about the element of "intent" in his murder conviction; (2) the trial court failed to give a missing witness charge; (3) the trial court wrongfully dismissed a juror; (4) the trial court did not sentence Petitioner under the juvenile offender statute; and (5) the trial court did not grant Petitioner youthful offender status. Mot to Amend Pet., Jul. 16, 2018, ECF No. 8. For the reasons set forth below, Petitioner's application [ECF No. 1] is denied.

_____

[1] The page citations for the Trial Transcript used in this decision and order refer to the pagination automatically generated by the Court's CM/ECF electronic filing system.

I. BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action. It was undisputed at trial that on the morning of June 20, 2011, Petitioner was involved in an argument at his residence with his thirteen year old female cousin ("Victim"), who then charged at him with a kitchen knife as he exited the residence into the garage. It was also undisputed that Petitioner was able to gain control of Victim's hand while she was holding the knife, and turned the knife on Victim, stabbing her 12 times in or around the neck area. The attending surgeon who operated upon Victim after she was rushed to the hospital testified at trial that the largest of the 12 wounds from the stabbing was approximately four centimeters in length, one centimeter in width, and eight centimeters deep. *See* Trial Tr. Vol. III, 318, June 11, 2018, ECF No. 6-3 ("I remember being able to place my index finger into it.").

Petitioner was indicted by a grand jury and charged with one count of attempted murder in the second degree, and one count of assault in the first degree. Trial Tr. I, 5, June 11, 2018, ECF No. 6-1. A jury trial commenced on February 14, 2012. Trial Tr. I at 181. In addition to testimony from Victim's surgeon, over the course of the trial the jury heard testimony from multiple police officers regarding blood and bits of duct tape found at the crime scene; from DNA experts confirming that the blood was Victim's; from Victim's brother and sister, who arrived on the scene shortly after Victim was found by her mother; and from the investigators who interviewed Petitioner after he was taken into custody. Based on the foundation established by the lead investigator, the jury also viewed a video recording of Petitioner's initial interview with investigators, in which he explained what occurred between he and Victim and provided details about how he "hit" her multiple times

in the neck with a knife. *See* Trial Tr. IV at 4. Neither Victim nor Petitioner testified at trial, nor did Victim's mother,[2] who discovered Victim on the floor of the garage following the stabbing and accompanied her to the hospital.

During defense counsel's summation, there was an issue with one of the jurors. Apparently, Juror Number Five was whispering something to a neighboring juror while counsel was speaking, and he asked, "do you need a break?" Trial Tr. IV at 159. After summations, as Juror Number Five was leaving the courtroom, court deputies observed her putting her hand over her heart as she passed defense counsel, and mouthing, "I'm sorry." Trial Tr. IV at 170–71. When the trial court addressed Juror Number Five outside of the presence of the other jurors, she stated that she was "just apologiz[ing] to [defense counsel] for being rude and dozing off a little bit when he was speaking." Trial Tr. IV at 172. When the trial court and counsel attempted to clarify what she meant by "dozing off," Juror Number Five further stated that she "didn't go totally out," meaning she did not fall fully asleep. Trial Tr. IV at 174. Nevertheless, after further discussion with counsel, and over the objection of defense counsel, the trial court indicated that it was "deeply concerned" and "greatly disturbed" by the possibility that the juror may have missed something, and disqualified her, replacing her with one of the alternate jurors for jury deliberations. Trial Tr. IV at 178.

Over multiple days of deliberation, the jury asked several questions of the trial court, most notably regarding the element of intent in the attempted murder charge. The trial court originally instructed the jury that "'[i]ntent' means conscious objective or

---

[2] Victim's mother was also Petitioner's legal guardian in this country. She was the head of a household that had fled Afghanistan after political persecution, lived in a camp in Pakistan for a time, and was offered asylum in this country. After arriving in the United States, Petitioner shared two apartments with Victim, Victim's mother, and Victim's several brothers and sisters in a complex in Henrietta, New York.

purpose. Thus, a person acts with intent to cause the death of another when that person's conscious objective or purpose is to cause the death of another person." Trial Tr. IV at 215. At the close of the first day of deliberations, the jury asked the Court to reread the two counts charged in the case, as well as the definitions of the alleged crimes. *See, e.g.,* Trial Tr. IV at 254. After another day of deliberations, the jury asked the trial court to reread the definition of the law for each of the elements of the attempted murder charge, and the trial court obliged. Trial Tr. IV at 285–86. After a break for the weekend, the jury again asked the trial court to restate the definition of attempted murder, and to clarify the definition of "beyond a reasonable doubt." The jury also asked, "Can one infer intent from indifference?" Trial Tr. IV 326–28. The trial court responded to each of these questions by re-reading to the jury in open court parts of the instructions it originally provided.

Then, on what would be the final day of deliberation, the jury sought more specific direction, asking:

> Is the element of intent satisfied for determining guilt for the attempted murder charge if it is concluded from the evidence that the defendant consciously intended to cause harm that could cause death and there is some evidence to support the conclusion that the defendant did not consciously intend to murder the victim?
>
> * * *
>
> It is okay to speak the law again but we would prefer a yes/no answer. If a yes/no answer is not possible, then an answer, quote, "it depends," close quotes would be helpful. For example, yes if certain conditions were met or no if other conditions were met.

Trial Tr. V, 6, June 11, 2018, ECF No. 6-5. After discussing potential responses with counsel, and hearing argument from defense counsel that "no" is the only conceivable answer to the jury's question, the trial court informed the jury that it could not give a "yes/no" answer to their question, and instead reread them the definition of attempted

murder. Trial Tr. V at 7–13. Just over an hour later, the jury returned a verdict of guilty against Petitioner on both counts.

At sentencing, the trial court noted that it was undisputed that Petitioner had stabbed Victim, and summarized what the evidence showed Petitioner's conduct to be following the stabbing:

> The evidence at the time of the trial was compelling that you dragged her to the other side of the car in the garage behind some boxes or some items that were in the garage and you left her there to bleed and to die. And when you couldn't keep her quiet by putting her hair in her mouth because she was probably spitting it out, gurgling in her own blood, you then went in the house to get some duct tape to try to put that over the hair and her mouth so that you could keep her quiet.
>
> . . . [Then] you did very calmly, collectively and very cleverly was you left that garage, you went to the other apartment that you stay at to get a change of clothes so your clothes would be different. You decided to leave and get away, leave her in that garage to die, to bleed to death.
>
> * * *
>
> And . . . you then went for a walk and you played some basketball with some friends. You went to the library. You were going to use the computer but then you realized . . . that if I use the computer at the library, somebody might find out where I am and they'll come and get me.
>
> So, you then left there and moved on and then said in your own words, boy, if they have some dogs following me I better walk on the sidewalk part of the time and the grass part of the time so the dogs can't follow me, all consciously thinking about how you could get away and leave and leave all that behind never once thinking, even anonymously, to call a doctor or 911 or something to let somebody know that somebody was bleeding to death in that garage.
>
> Fortunately for you you're not facing a murder charge because those other relatives came home and they found her there in that garage in time to take her partly to the hospital and then have the ambulance take her the rest of the way.

Trial Tr. V at 67–69.

Based on what the trial court called "the brutal and senseless nature of the crimes," the trial court denied Petitioner's request for "youthful offender" status. Trial Tr. V at 69 (citing *People v. Davis*, 84 A.D.3d 1710 (N.Y. App. Div. May 6, 2011). The trial court also declined to find that Petitioner was 15 years old at the time of the offense, and rejected counsel's suggestion that he should be sentenced under the juvenile offender statute. Trial Tr. V at 72–77. Instead, the trial court sentenced Petitioner to a determinate sentence of 16 years' imprisonment on each of the two counts of conviction, to run concurrently. Trial Tr. V at 71.

In March 2018, Petitioner filed a petition under 28 U.S.C. § 2254 seeking habeas relief. Pet., Mar. 2, 2018, ECF No. 1. After Respondent had filed a response and the state court record, Petitioner sought leave to amend his petition, which the Court subsequently granted. Dec. and Order, Aug. 20, 2018, ECF No. 10. Thereafter, Petitioner moved this Court to stay the proceedings and hold the matter in abeyance while he sought to exhaust state court remedies on his claim that he was illegally sentenced as an adult when he should have been sentenced as a juvenile offender. Letter, June 17, 2019, ECF No. 15.

The Court granted the motion, and directed Petitioner to "file a status report with the Court within 60 days of the date of this Order, and every [60] days thereafter for so long as his [N.Y. Crim. Pro. L. § 440.20] motion . . . is pending in the State courts." Text Order, Jul. 22, 2019, ECF No. 18. In June 2022, after allowing ample time for Petitioner to exhaust his post-conviction remedies in state court, this Court found that Petitioner's matter was no longer "pending" in state court, and lifted the stay on Petitioner's application for habeas relief. Dec. and Order, June 16, 2022, ECF No. 43.

## II. LEGAL PRINCIPLES

Petitioner, a person in custody pursuant to the judgment of a State court, makes his habeas corpus application pursuant to 28 U.S.C. § 2254. The general legal principles applicable to such a claim are well-settled. Federal courts are obliged to give deference to state courts' decisions. *See Chrysler v. Guiney*, 806 F.3d 104, 117 (2d Cir. 2015) (citing The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214). "First, the exhaustion requirement ensures that state prisoners present their constitutional claims to the state courts in the first instance." *Jackson v. Conway*, 763 F.3d 115, 132 (2d Cir. 2014). Second, "[s]hould the state court reject a federal claim on procedural grounds, the procedural default doctrine bars further federal review of the claim, subject to certain well-established exceptions." *Id.* (citing *Wainwright v. Sykes*, 433 U.S. 72, 82–84 (1977)). Lastly, for claims adjudicated on the merits in state court, a federal court may issue a writ of habeas corpus only when the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . ." *Chrysler*, 806 F.3d at 117 (quoting 28 U.S.C. § 2254(d)(1)).

28 U.S.C. § 2254(b)'s "exhaustion requirement is not satisfied unless the [petitioner's] federal claim has been 'fairly presented' to the state courts." *Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*). When state law procedurally bars a petitioner from exhausting his remedies for a federal claim, the district court may deem the claims exhausted but procedurally defaulted. *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) (citations omitted). However, where the court makes such a determination, the petitioner is precluded from litigating the merits of the claim unless he can show cause

for the procedural default and resulting prejudice, or can demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice (i.e., that he is actually innocent). *See Wainwright v. Sykes*, 433 U.S. 72, 87–91 (1977).

Further, with respect to the procedural default doctrine, the Supreme Court has held that claims underlying a habeas petition may be procedurally barred from habeas review if they were decided at the state level on adequate and independent procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729–33 (1991). In a case where a state court decision rests on an independent state law ground adequate to support the judgment, federal habeas courts defer to the "state's interest in enforcing its laws." *Garcia v. Lewis*, 188 F.3d 71, 76 (2d Cir. 1999) (quoting *Coleman*, 501 U.S. at 730–31). A ruling on an independent state law ground is adequate to support a judgment where the ruling is "firmly established and regularly followed" by the state courts. *Garcia*, 188 F.3d at 77 (quoting *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991)).

Lastly, federal courts considering claims that were decided by state courts on the merits must employ "a highly deferential standard for evaluating state-court rulings" and must give those state-court decisions "the benefit of the doubt." *Jones v. Murphy*, 694 F.3d 225, 234 (2d Cir. 2012) (quoting *Hardy v. Cross*, 565 U.S. 65, 66 (2011)). A principle is "clearly established Federal law" for § 2254 purposes when it is embodied in a Supreme Court holding framed at the appropriate level of generality. *Washington v. Griffin*, 876 F.3d 395, 403 (2d Cir. 2017) (quoting, *inter alia*, *Thaler v. Haynes*, 559 U.S. 43, 47 (2010)). A state court decision is "contrary to" such clearly established law when the state court either has arrived at a conclusion that is the opposite of the conclusion reached by the Supreme Court on a question of law, or has "decided a case differently than the

Supreme Court has on a set of materially indistinguishable facts." *Washington*, 876 F.3d at 403 (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)). An "unreasonable application" of such clearly established law occurs when the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case such that "the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Washington*, 876 F.3d at 403 (citation omitted).

## III. DISCUSSION

Because Petitioner is a *pro se* litigant, his papers have been "construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citation omitted). As amended, Petitioner's application identifies five alleged errors by the trial court that he believes to warrant habeas relief, each of which were raised on direct appeal: (1) the failure to meaningfully answer the jury's questions about the element of intent; (2) the failure to grant a missing witness charge regarding Victim and her mother; (3) the improper dismissal of Juror Number Five; (4) the denial of Petitioner's motion to be sentenced as a youthful offender; and (5) the refusal to sentence Petitioner under the juvenile offender statute. *See* Mot. to Amend, 9, Jul. 16, 2018, ECF No. 8 (specifically incorporating the arguments and statement of facts from the brief for Petitioner's direct appeal).

After a thorough review of Petitioner's papers and the transcripts and records of the state court proceedings, the Court finds in accordance with Rule 8 of the Rules Governing Section 2254 Cases that an evidentiary hearing is not necessary to address Petitioner's arguments. *See also* 28 U.S.C. § 2254(e)(2). Further, the Court finds that all

of Petitioner's arguments are without merit. For ease of discussion, the arguments are addressed out of order.

## A. The Trial Court's Refusal to Give a "Missing Witness" Charge

At a charge conference prior to summations, defense counsel requested that the trial court give the jury a "missing witness" instruction[3] for Victim and her mother because they did not testify at trial. Trial Tr. IV at 116–17. With respect to Victim's mother, the prosecution maintained that she did not witness Petitioner's assault on Victim, and hence that she did not possess material knowledge. Trial Tr. IV at 118. With respect to Victim, the prosecution argued that as a minor child whose mother refused to allow her to testify, she was neither available to be called as a witness nor under the control of the prosecution. Trial Tr. IV at 119, 123. The trial court found that the prosecution did not have control of either Victim or her mother, and therefore denied the motion for a missing witness charge. Trial Tr. IV at 124.

Petitioner challenged the trial court's ruling on direct appeal, and the state appellate court held that "[e]ven assuming, *arguendo*, that the court erred in denying the request, [the court] conclude[s] that any error is harmless inasmuch as the evidence of [Petitioner]'s guilt is overwhelming, and there is no significant probability that [Petitioner]

---

[3] Under New York law, a "missing witness" instruction is appropriate where it is shown "(1) that there is an uncalled witness believed to be knowledgeable about a material issue pending in the case, (2) that such witness can be expected to testify favorably to the opposing party, and (3) that such party has failed to call the witness to testify." *People v. Smith*, 128 N.E.3d 649 (N.Y. 2019) (punctuation omitted). However, the instruction should not be issued if the party that has failed to call the witness is able to show "that the witness is not 'available,' or that the witness is not under the party's 'control' such that he would not be expected to testify in his or her favor." *People v. Gonzalez*, 502 N.E.2d 583 (N.Y. 1986); *see also United States v. Caccia*, 122 F.3d 136, 139 (2d Cir. 1997) ("the inference is not available to be drawn against a party who . . . lacks meaningful or pragmatic access to the witness.")).

would have been acquitted but for the error." *People v. Abdul-Jaleel*, 142 A.D.3d 1296, 1297 (N.Y. App. Div. Sept. 30, 2016).

At the outset, the Court notes that the United States Supreme Court has "stated many times that federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Pulley v. Harris*, 465 U.S. 37, 41 (1984)) (internal quotation marks omitted). Indeed, a state court's failure to give the jury a missing witness instruction "cannot be the basis for federal habeas corpus relief unless such a failure so infects the entire trial that the resulting conviction violated due process." *Morillo v. Crinder*, No. 97 CIV. 3194(SAS), 1997 WL 724656, at *5 (S.D.N.Y. Nov. 18, 1997).

In the present case, there is no reason to believe that the failure to give the missing witness charge violated Petitioner's right to due process, or had any impact on the outcome of Petitioner's trial. To begin with, the missing witness charge under New York law merely *permits* the jury to draw a negative inference; "it does not *require* them to do so." *Murphy v. Warden of Attica Corr. Facility*, No. 20CIV3076PAEGWG, 2022 WL 1145050, at *16 (S.D.N.Y. Apr. 19, 2022) (citing *DeVito v. Feliciano*, 1 N.E.3d 791 (N.Y. 2013)) (emphasis added). Moreover, although the trial court did not give a missing witness instruction, the court did allow defense counsel to comment on multiple occasions during summation about the fact that neither the Victim nor her mother testified, and that their failure to testify could be inferred as a lack of evidence. Trail Tr. IV at 124–25. Accordingly, Petitioner's claim relating to the missing witness charge does not provide a basis for habeas relief. *Murphy*, 2022 WL 1145050 at *16 (citing, *inter alia*, *Bisnauth v. Morton*, No. 18-CV-4899 (JFB), 2021 WL 3492746, at *14-15 (E.D.N.Y. Aug. 9, 2021)

(failure to issue a missing witness charge is generally not grounds for habeas relief) (collecting cases)).

B. The Trial Court's Dismissal of Juror Number Five

As described in more detail above, the trial court in this case dismissed Juror Number Five over defense counsel's objection after she admitted to "dozing off" during part of defense counsel's summation. On Petitioner's direct appeal, the state appellate court concluded that the court did not err in discharging the juror. *Abdul-Jaleel*, 142 A.D.3d at 1296. In the application presently before the Court, Petitioner maintains that he was denied his "United States constitutional right to a trial by a jury of my choice when [the] trial court improperly dismissed . . . one of my jurors . . . ." Pet. at 16.

However, contrary to Petitioner's assertion that he is entitled to a jury of "his choice," it is well-settled that the Sixth Amendment right to a criminal jury trial guarantees to the criminally accused only "a fair trial by a panel of impartial, 'indifferent' jurors," and not to a panel of jurors of the accused's choice. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Yet regardless of the accuracy of Petitioner's legal theory, his "[a]llegations of improper juror dismissal evoke the Sixth Amendment right to an impartial jury and the Fourteenth Amendment right to due process." *Baston v. Artus*, No. 08-CV-3425 (RJD), 2010 WL 5067696, at *2 n.1 (E.D.N.Y. Dec. 6, 2010) (internal citations omitted).

After a thorough review of the record of the incident, the Court finds that Petitioner's claim as to the trial court's dismissal of Juror Number Five fails on the merits. Under N.Y.C.P.L. § 270.35, a trial court must discharge a juror if "the court finds, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve in the case . . . ." The Second Circuit has explained that "a trial judge is vested with very

broad discretion to deal with problems that arise in connection with jury deliberations or a juror's fitness to deliberate." *United States v. Rosario*, 111 F.3d 293, 299 (2d Cir. 1997)). Hence, "a trial court's finding that a sworn juror was not fit for further service is a factual determination that is entitled to a presumption of correctness unless unsupported by the record." *Hughes v. Phillips*, 457 F. Supp.2d 343, 368 (S.D.N.Y. 2006) (citing, *inter alia*, *Marshall v. Lonberger*, 459 U.S. 422 (1983)).

Here, once the trial court was made aware of a situation with Juror Number Five, it promptly held "a probing and tactful inquiry into the facts of the situation," during which both counsel were present and permitted to participate with questions of their own. *Abdul-Jaleel*, 142 A.D.3d. at 1297. Juror Number Five admitted that she "dozed off" during defense counsel's summation, and despite indicating that the episode would not affect her deliberations, failed to alleviate the concerns of both the trial court and the prosecution. Therefore, the trial court's decision to remove Juror Number Five and replace her with an alternate juror was sufficiently supported by the record, especially in light of the fact that it is "[t]he trial judge who was in a position to observe the demeanor of the juror." *Holder v. Lamanna*, No. 18-CV-7431 (PKC), 2020 WL 804902, at *5–7 (E.D.N.Y. Feb. 18, 2020) (quoting *McShall v. Henderson*, 526 F. Supp. 158, 162 (S.D.N.Y. 1981)).

Further, even if the trial court erred by dismissing Juror Number Five, Petitioner would still not be entitled to relief because he has not demonstrated that he was prejudiced by the dismissal. "[N]o constitutional claim can arise from the substitution of one juror for another unless the petitioner can demonstrate that the replacement juror was biased or otherwise unfit to serve." *Council v. Capra*, No. 14-CV-1849 (PKC) (MHD),

13

2015 WL 13746663, at *14 (S.D.N.Y. Sept. 24, 2015), *report and recommendation adopted*, No. 14-CV-1849 (PKC), 2016 WL 165022 (S.D.N.Y. Jan. 14, 2016); *Johnson v. Artuz*, No. 00-CV-6106 (MAT), 2006 WL 1144513, at *7 (W.D.N.Y. May 1, 2006) (rejecting a petitioner's claim when he "failed to establish that the substitution resulted in any prejudicial impact on the outcome of his trial").

Here, Petitioner does not cite any evidence to suggest that the trial court's decision to dismiss Juror Number Five in any way affected the outcome of his trial, or that the juror who replaced the dismissed juror was biased or otherwise unfit to serve. "Since [Petitioner] has in no way established the partiality of the jury that ultimately convicted him, he may not successfully claim deprivation of his sixth amendment or due process rights." *Lleshi v. LaClair*, No. 13-CV-5874 (VB) (JCM), 2017 WL 1319798, at *12 (S.D.N.Y. Jan. 26, 2017), *report and recommendation adopted*, No. 13-CV-5874 (VB), 2017 WL 1319927 (S.D.N.Y. Apr. 7, 2017) (quoting *United States v. Towne*, 870 F.2d 880, 885 (2d Cir. 1989)).

Accordingly, Petitioner has failed to demonstrate that the trial court's decision to discharge Juror Number Five is a ground for habeas relief.

C. The Trial Court's Response to Questions from the Jury

As detailed above, jurors asked multiple questions of the trial court during their deliberations. For each question regarding the various elements of the offenses with which Petitioner was charged, the trial court responded by re-reading to jurors the instructions the court had provided following the close of summations. On direct appeal, Petitioner challenged the trial court's response specifically to the jurors' last question, which sought a "yes/no" answer to their question about the element of intent. The state

appellate court rejected Petitioner's contention that the trial court failed to provide a meaningful response to the jury's questions, stating that "[p]articularly in light of the phrasing of the question and the jury's apparent misstatement of the law, we conclude that the court appropriately declined to give a categorical 'yes' or 'no' answer in favor of providing a more expansive supplemental instruction." *Abdul-Jaleel*, 142 A.D.3d at 1297–98. Petitioner again challenges the trial court's response in the present application.

New York Criminal Procedure Law § 310.30 establishes the procedure by which a trial court must respond to requests from the jury "for further instruction or . . . with respect to any other matter pertinent to the jury's consideration of the case." N.Y.C.P.L. § 310.30. When the court receives such a request, it "must direct that the jury be returned to the courtroom and, after notice to both the people and counsel for the defendant, and in the presence of the defendant, must give such requested information or instruction as the court deems proper." N.Y.C.P.L. § 310.30. In responding to the jury requests, the trial court "is vested with some measure of discretion in framing its response and is in the best position to evaluate the jury's request in the first instance." *People v. Santi*, 818 N.E.2d 1146, 1155 (N.Y. 2004). "[A] simple reiteration of an original instruction suffices as a meaningful response . . . when the original instruction is accurate and where the jury expresses no confusion regarding the original charge." *Joseph v. Conway*, No. 07-CV-5223 (DC), 2023 WL 3092877, at *11 (E.D.N.Y. Apr. 26, 2023) (quoting *Santi*, 818 N.E.2d at 1155) (internal quotation marks omitted).

Here again, the Court notes that "federal habeas corpus relief does not lie for errors of state law." *Estelle,* 502 U.S. at 67. Petitioner cites to no federal authority in the counseled appellate brief upon which he relies in support of his jury note claim, aside

from a passing reference to his "right to an adequate trial by jury and to due process" in the final paragraph of his 10-page argument. "Because petitioner alleges nothing more than a possible violation of New York Criminal Procedure Law [§] 310.30, he has not raised a claim that is cognizable on federal habeas corpus review." *Cornado v. Bellnier*, No. 10 CIV. 5265 RA HBP, 2012 WL 6644637, at *6 (S.D.N.Y. Sept. 20, 2012), *report and recommendation adopted*, No. 10 CIV. 5265 RA, 2012 WL 6681692 (S.D.N.Y. Dec. 21, 2012) (collecting cases).

Moreover, even if the Court were to find that Petitioner's claim were cognizable on federal habeas review, it would be found to be without merit. The record is clear that after the trial court received the notes from the jury, the court complied with the requirements of N.Y.C.P.L. § 310.30 by hearing argument from the prosecution and defense counsel regarding potential responses, calling the jury back into the courtroom, and giving the requested instruction or information in the presence of counsel and Petitioner himself. *See, e.g.*, Trial Tr. V at 6–8. Rather than confuse the jury with attempts at additional instruction, the trial court – in its discretion – gave a simple reiteration of its original instruction, which the state appellate court found to be appropriate. *Abdul-Jaleel*, 142 A.D.3d at 1298.

Thus, because the record reflects that the trial court complied with its "meaningful notice" and "meaningful response" obligations under N.Y.C.P.L. § 310.30, Petitioner's claim is meritless. *Joseph*, 2023 WL 3092877 at *11. *See also Corines v. Superintendent, Otisville Corr. Facility*, 621 F. Supp.2d 26, 37–38 (E.D.N.Y. 2008) (finding that the fact that the jury reached a unanimous guilty verdict shortly after returning to deliberations

following further an instruction from the trial court does not rebut the strong presumption that that the jury in reaching its verdict complies with the court's instructions).

D. The Trial Court's Denial of Youthful Offender Status

Under New York law, "[c]ertain youths convicted of a 'crime' which was committed when they were less than 19 years of age may have that conviction set aside and a 'youthful offender adjudication' substituted, with the effect that such a youth does not stand convicted of a crime . . . . [and the] sentencing options . . . were designed to reflect a measured extension of leniency." William C. Donnino, "Practice Commentary on N.Y. Penal Law § 60.02," N.Y. Penal Law § 60.02 (McKinney). The Second Circuit has explained that "[t]he granting or denial of youthful offender treatment is analogous to that of sentencing where courts have wide discretion even though there are few or no statutory guidelines for the exercise of such discretion." *United States ex rel. Frasier v. Casscles*, 531 F.2d 645, 647 (2d Cir.1976) (citations omitted). If the reviewing court determines that the sentencing "judge has exercised [his] discretion within statutory limits, appellate review is at an end." *Id.* Further, "it is well established that the United States Constitution grants no independent due process right either to youthful offender treatment or to any particular procedure for denying it, so long as the trial judge imposed a sentence that was lawful under state law. . . ." *Jones v. Perez*, No. 6:14-CV-6502 MAT, 2015 WL 268917, at *2 (W.D.N.Y. Jan. 21, 2015) (citation omitted).

In the present case, the trial court "carefully considered" Petitioner's request to be considered a youthful offender for sentencing, and denied the request because he "committed a serious offense that resulted in permanent and severe injuries to the young victim . . . . [his] prognosis for lawful behavior is guarded to poor and he has failed to

accept responsibility for his actions." Trial Tr. V at 66. Given the overwhelming nature of the evidence against Petitioner in this case, and the careful record the trial court created both during the course of the trial and at sentencing, the Court cannot say that the trial court's denial of youthful offender status was an abuse of discretion. *See, e.g.,* Trial Tr. V at 69 (citing to *People v. Davis*, 84 A.D.3d 1710 (N.Y. App. Div. May 6, 2011) and *People v. Gibson*, 89 A.D.3d 1514 (N.Y. App. Div. Nov. 18, 2011) in support of its decision). Moreover, as the state appellate court found, the sentence imposed was lawful and "not unduly harsh or severe." *Abdul-Jaleel*, 142 A.D.3d at 1299. Under such circumstances, Petitioner's claim regarding the state court's refusal to afford him youthful offender status cannot serve as grounds for habeas relief. *Capps v. Kaplan*, No. 1:10-CV-0784 MAT, 2014 WL 6627489, at *7 (W.D.N.Y. Nov. 21, 2014).

E. The Trial Court's Refusal to Sentence Petitioner Under the Juvenile Offender Statute

Lastly, Petitioner maintains that the trial court erred by declining to sentence him under New York's juvenile offender statute. At sentencing, defense counsel stated that "it is our position that the Court should be sentencing under the Juvenile Offender Statute in that it is our position that [Petitioner] was 15 years old at the time of this offense." Trial Tr. V at 72. In support of that position, counsel argued that Petitioner's real birthdate was not his listed birthdate of December 31, 1994, which he believed to be a fictitious date made up by immigration officials when Petitioner could not produce documents verifying his date of birth. Trial Tr. V at 72–76. Rather, counsel indicated that they had discovered a document from Petitioner's native country of Afghanistan that showed Petitioner to be 15 years old at the time of the offense. Trial Tr. at 75.

The trial court denied counsel's motion, and indicated it had sufficiently stated its reasons on the record for finding Petitioner to have been 16 years old at the time of the offense. Trial Tr. at 77. As the trial court recounted based on the evidence presented at trial,

> When [Petitioner] was arrested and detained and was going to have conversations with law enforcement, before the investigators engaged him in conversations, the investigators possessed documents indicating that the defendant was 16 years of age at the time this terrible tragedy took place.
>
> Prior to the interview . . . immigration documents that were located inside of the residence contained the defendant's photograph and birthday printed as 12/13/94 that would suggest to law enforcement that he was 16 years old at the time of these events, which was June 20th, 2011.
>
> Notwithstanding that, before engaging this defendant in conversations, Investigator Ponticello returned back to his office and called Border Patrol. Border Patrol agents provided the investigator with the defendant's date of birth, December 31st, 1994, as contained in the Border Patrol's computer records.
>
> The investigators continued with some further due diligence on this issue as was developed at a hearing in this matter and in terms of what this Court found and the conclusions of law it came to.
>
> When a prisoner data report was completed listing December 31st, 1994 as the defendant's date of birth, that information was provided not only from what I just mentioned, including the information from Border Patrol, but also upon information from the school district that [Petitioner] attended.
>
> The investigators identified, at least as testified to at the hearing and found by this Court, that they identified a deployment authorization issued by the United States Department of Justice, a permanent resident card issued by the United States Department of Homeland Security, and the defendant's school identification for the Ninth Grade Academy in Henrietta, each of which listed the defendant's date of birth as December 31st, 1994.
>
> Finally, the investigators spoke with the defendant's aunt in conjunction with this issue and represented to them that she believed him to be 16 years of age based on everything she knew at that time. The record should be clear about that issue in that regard, that that was the information this Court had before it and consequently, this Court, upon sentencing, determines or

reaffirms its prior ruling that for purposes of sentencing, [Petitioner] was of the age of 16 [at the time of the offense].

Trial Tr. V at 62–64.

28 U.S.C. § 2254(e)(1) requires district courts reviewing habeas applications to presume that the factual findings of state courts are correct. *See Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir.1997). In order to rebut this presumption, a petitioner must present "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In the present case, Petitioner has presented no evidence—let alone clear and convincing evidence—to rebut the presumption that the factual determinations found by the hearing court are correct. When the state appellate court considered Petitioner's challenge to the trial court's ruling on this issue on direct appeal, it concluded that Petitioner's remedy was "to make a motion to set aside the sentence pursuant to [N.Y.] C.P.L. § 440.20." *Abdul-Jaleel*, 142 A.D.3d at 1298. Indeed, this Court, having received Petitioner's original application in March 2018, granted a stay and held this matter in abeyance for nearly three years while Petitioner "sought to exhaust state court remedies on his claim that he was illegally sentenced as an adult when he should have been sentenced as a juvenile offender." Dec. and Order, 1, June 16, 2022, ECF No. 43. Despite ample time to do so, Petitioner never produced evidence in either state court or before this Court to support his claims.

Accordingly, the Court presumes that the trial court's factual finding was correct regarding Petitioner's age at the time he committed the offenses, and Petitioner's claim is without merit.

IV. CONCLUSION

Based on the foregoing, it is hereby ORDERED that Petitioner Faheem Abdul-Jaleel's application for habeas relief [ECF No. 1] is denied. Pursuant to 28 U.S.C. § 2253, the Court declines to issue a certificate of appealability, since Petitioner has not made a substantial showing of the denial of a constitutional right. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

DATED:      May 3, 2023
            Rochester, New York

CHARLES J. SIRAGUSA
United States District Judge